## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **CHARLES OPHEIM,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **CASE NO. 3:16-CV-1097-N-BK** |
| | § | |
| **WELLS FARGO BANK, and** | § | |
| **OCWEN LOAN SERVICING, LLC,** | § | |
| | § | |
| **Defendants.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to *Special Order 3* and 28 U.S.C. § 636(b), the Court now considers

Defendants' *Motion for Summary Judgment*, Doc. 18.  For the reasons that follow, it is

recommended that the motion be **GRANTED**.

### A.  Procedural History

Plaintiff filed this action in state court in March 2016.  Doc. 1-4 at 1.  He alleged that he

had obtained a home equity loan (the "Loan") in 2007 that was subsequently assigned to

Defendant Wells Fargo Bank ("Wells Fargo") and serviced by a company that Defendant Ocwen

Loan Servicing, LLC ("Ocwen" or, collectively, "Defendants") later acquired.  Doc. 1-4 at 4.

Plaintiff claimed that in December 2010, he was advised that his Loan was in default, which

occurred when Ocwen wrongfully obtained lender-placed insurance ("LPI") on his home even

though he had maintained insurance coverage on the property.  Doc. 1-4 at 5.  Plaintiff asserted

that his Loan payments were deposited thereafter into an unauthorized escrow account to pay for

the LPI.  Doc. 1-4 at 5-6.  Plaintiff alleged that while Defendants eventually cancelled the LPI in

February 2011, they continued to assert that he was in default, and they credited the refunded

premiums to the escrow account, rather than towards Plaintiff's Loan payments, until April 2011. Doc. 1-4 at 6-7.

Additionally, Plaintiff averred that his attempts to secure financing from alternate sources were thwarted because Defendants had reported his purportedly delinquent Loan to a credit reporting agency.  Doc. 1-4 at 6-7.  Plaintiff maintained that he was notified that his Loan was in default despite his repeated demands over a four-year period that Defendants rectify the situation, and Defendants have refused to correct the improper accounting of the Loan and, instead, initiated a foreclosure action against him.  Doc. 1-4 at 7.  Plaintiff contended that in November 2015, Wells Fargo commenced an expedited foreclosure proceeding in Texas state court based on a Loan balance that was incorrect due to the alleged mishandling of his payments. Doc. 1-4 at 7-8.

Based on these contentions, Plaintiff asserted causes of action for: (1) breach of contract (only as to Wells Fargo); (2) the common law tort of unreasonable debt collection; (3) negligence; (4) violations of the Texas Debt Collection Act ("TDCA"), §§ 393.303 and 393.304; and (5) a declaratory judgment to the effect that Defendants failed to properly apply his Loan payments and misstated that the Loan was in default.  Doc. 1-4 at 8-15.  Defendants removed the case to this Court in April 2016 and obtained dismissal of all of Plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure except his claims for breach of contract, violations of the TDCA, and declaratory relief.  Doc. 9; Doc. 10.  Defendants now move for summary judgment on the three remaining claims.  Doc. 18.

**B.  Applicable Law**

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of

law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). A dispute

regarding a material fact is "genuine . . . if the evidence is such that a reasonable jury could

return a verdict in favor of the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986) (internal quotation marks omitted). When ruling on a motion for summary

judgment, the court is required to view all facts and inferences in the light most favorable to the

nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v.

Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). Once the moving party has made an initial

showing that there is no evidence to support the nonmoving party's case, the party opposing the

motion must come forward with competent summary judgment evidence showing the existence

of a genuine dispute of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no genuine issue for trial." *Id.* at 587.

## C. Undisputed Facts

Plaintiff obtained the Loan from Option One Mortgage Corporation ("Option One") in

April 2007. Doc. 20 at 9-11. The Loan was secured by a Deed of Trust ("DOT") that placed a

lien on Plaintiff's homestead, which was located at 11248 Jamestown Road, Dallas, Texas 75230

(the "Property"). Doc. 20 at 12. The terms of the Loan are set forth in a Home Equity Note

("Note"), the DOT, and a Texas Equity Loan Affidavit. Doc. 20 at 9-21. Plaintiff also executed

an Escrow Account Agreement in connection with the purchase of his home. Doc. 20 at 23. The

DOT requires Plaintiff to make monthly payments of certain "Escrow Items," including taxes

and property insurance premiums on the Property. Doc. 20 at 13. The DOT further requires

Plaintiff to keep the Property insured against loss by fire and other hazards and to promptly

provide the lender with all receipts of paid premiums and renewal notices. Doc. 20 at 13-14. If

Plaintiff failed to maintain the required insurance coverage, the DOT provides that the lender

may obtain such coverage to protect its rights in the Property and may advance funds to pay for

the insurance premiums.  Doc. 20 at 13-14.  If the lender does so, any funds advanced by the

lender become additional debt secured by the DOT and may bear interest at the Note rate.  Doc.

20 at 15.

        In the Escrow Account Agreement, Plaintiff agreed to pay the Escrow Items "when due

and in the amount due" in lieu of making monthly deposits into an escrow account.  Doc. 20 at

23.  Plaintiff also agreed to provide proof, within ten calendar days of receiving the lender's

written request for such proof, of the payment of "continuous homeowner's insurance coverage,

for each coverage period, prior to the expiration of current policy."  Doc. 20 at 23. The Escrow

Account Agreement itself provides that:

> **If Borrower fails to timely pay all or any portion of an Escrow Item (or is in default under any other provision of the Note or Security Instrument), if Borrower fails to provide Lender proof of payment of an Escrow Item within ten (10) days of Lender's request for such proof, or if Lender must advance funds to pay all or any portion of an Escrow Item, Lender may thereafter, in its sole discretion, exercise its contractual right to require Borrower to set up an Escrow Account for the payment of the Escrow Items.**

Doc. 20 at 23 (emphasis in original).  If the lender established an escrow account pursuant to that

provision, the Escrow Account Agreement provides that Plaintiff's monthly payment would be

increased to include the monthly amount necessary to pay the Escrow Items.  Doc. 20 at 23.

        In 2010, the servicer of Plaintiff's Loan was American Home Mortgage Servicing, Inc.,

which later changed its name to Homeward Residential ("Homeward").  Doc. 20 at 6.  In

February 2010, Homeward received a cancellation notice from Plaintiff's insurance carrier

with respect to the policy then in place on the Property.  Doc. 20 at 6; Doc. 20 at 26.  On April 7,

2010, Homeward requested proof of insurance coverage from Plaintiff's insurer, but did not receive it. Doc. 20 at 6; Doc. 20 at 26. Accordingly, in September 2010, Homeward obtained a property insurance policy, disbursed $7,186.34 to pay the premium on the policy, and established an escrow account for the LPI. Doc. 20 at 6-7; Doc. 20 at 26, 30, 42, 50.

Later that month, Homeward sent a notice to Plaintiff advising him of the LPI policy, the advance of funds, and the establishment of an escrow account. Doc. 20 at 7; Doc. 20 at 46-47. The notice also informed Plaintiff that Homeward would "conduct an escrow analysis to begin collecting for the amounts already disbursed and for future installments as well." Doc. 20 at 46. The notice further stated that an escrow analysis disclosure statement would be mailed to Plaintiff under separate cover informing him of his "new payment amount and the effective date of that new payment." Doc. 20 at 46. The promised statement was sent to Plaintiff in September 2010 and notified him that his escrow account was $10,180.66 short. Doc. 20 at 48-49. The statement further explained that, effective November 1, 2010, Plaintiff's monthly payment would be increased to $3,158.22, which would consist of principal and interest of $1,710.97 and a monthly escrow payment of $1,447.25 to cover both the amount already advanced and amounts that would be due once the new policy expired. Doc. 20 at 48.

In October 2010, Homeward sent Plaintiff a November monthly billing statement for $3,158.22. Doc. 20 at 50. However, Plaintiff only tendered $1,800.00. Doc. 20 at 42, 51. Because that amount was insufficient to cover the November payment, those funds were placed into a suspense status. Doc. 20 at 51. Plaintiff again tendered $1,800.00 on December 6, 2010. Doc. 20 at 42, 51. Those funds were then placed in suspense with the other $1,800.00 from November. Doc. 20 at 51. Shortly thereafter, Homeward (1) withdrew $3,158.22 from the

suspended funds and applied it to Plaintiff's November 1, 2010 payment and (2) withdrew the remaining $441.78 from suspense and applied it to the escrow account. Doc. 20 at 42, 51-52.

In January 2011, Plaintiff tendered a payment of $3,600.00, $3,158.22 of which was applied to his December 2010 payment − $478.96 to principal, $1,532.01 to interest, and $1,447.25 to escrow. Doc. 20 at 53. The remaining balance of $441.78 was temporarily placed in suspense and then applied to the escrow account. Doc. 20 at 27, 30, 41-42, 53-54.

In February 2011, Homeward received proof of a new insurance policy reflecting that there had been no lapse in coverage. Doc. 20 at 7, 27, 55-56. Accordingly, Homeward cancelled the LPI policy and received a $7,186.34 refund, which it posted to the escrow account to repay the advance, leaving an overage in the account of $3,867.09. Doc. 20 at 27, 30, 41, 58. Homeward did not immediately refund the overage, however, as the account was in delinquent status. Doc. 20 at 30. Thereafter, Homeward conducted a new escrow analysis, removing the monthly escrow payment and re-adjusting Plaintiff's monthly mortgage payment back to $1,710.97, effective as of the January 1, 2011 payment. Doc. 20 at 7; Doc. 20 at 59-60.

Homeward did not initially disburse the $3,867.09 overage in the escrow account to Plaintiff because he was in default, but in April 2011, Homeward applied the overage funds to Plaintiff's January and February 2011 payments, the accrued late charge balance, and an extra principal payment. Doc. 20 at 7; Doc. 20 at 27, 30, 41; Doc. 20 at 62. Shortly thereafter, Homeward reversed the late charges for the September through December 2010 payments and requested a change in credit reporting so the Loan would be reported as "current" for that time period. Doc. 20 at 30, 41; Doc. 20 at 63-65.

Despite this, Plaintiff remained in default because he did not make any payments after January 2011. Doc. 20 at 7; Doc. 20 at 41. Plaintiff remained in default until January 2012

when Homeward received $44,087.67, which was sufficient to reinstate the Loan.  Doc. 20 at 7; Doc. 20 at 27, 33-41.  Thereafter, there was no escrow account, Plaintiff's monthly payment consisted only of $1,710.97 due for principal and interest, and his next payment was due on February 1, 2012.  Doc. 20 at 7.  When Plaintiff failed to make a payment in February 2012, the Loan almost immediately went back into default.  Doc. 20 at 7; Doc. 20 at 33.  In March and April 2012, Plaintiff tendered payments that were applied to the February and March installments, respectively.  Doc. 20 at 8; Doc. 20 at 32-33.  Plaintiff has not made any payments since April 2012.  Doc. 20 at 8; Doc. 20 at 32, 66.  In the meantime, in June 2011, Option One assigned the DOT to Wells Fargo, and in March 2013, Homeward transferred servicing of the Loan to Ocwen.  Doc. 20 at 6; Doc 20 at 24; Doc. 20 at 67-71.

In August 2014, Plaintiff sued Wells Fargo in state court (the "2014 Case"), alleging that the Loan did not comply with certain requirements in Section 50(a)(6), Article XVI of the Texas Constitution and seeking to avoid foreclosure and remove a cloud on the title.  Doc. 20 at 77-84. Wells Fargo removed the case to this Court and counterclaimed for judicial foreclosure based on Plaintiff's failure to make any payments on the Loan since April 2012.  Doc. 20 at 99-104; *see Opheim v. Wells Fargo Bank*, Civil Action No. 3:14-CV-3406-BF.  In February 2015, pursuant to a joint stipulation, Plaintiff's claims in the 2014 Case were dismissed with prejudice and Wells Fargo's counterclaim was dismissed without prejudice.  Doc. 20 at 105-08.  In November 2015, Wells Fargo filed an expedited application in state court seeking an order allowing it to foreclose on the Property.  Doc. 20 at 109-13. Plaintiff then filed this suit in state court in March 2016, and Defendants removed the case to this Court based on diversity jurisdiction.  Doc. 1 at 2-4.

## D. Arguments and Analysis

### 1. Breach of Contract

Wells Fargo asserts, *inter alia*, that Plaintiff's breach of contract claim is meritless because Homeward complied with the DOT when it force-placed insurance on the Property, and all of Plaintiff's other allegations of breach flow from that single act. Doc. 19 at 11. Therefore, any subsequent actions taken (or not) by Wells Fargo cannot constitute a breach. Doc. 19 at 11-13.

Plaintiff responds that Wells Fargo's argument is flawed because it did not produce (1) the insurance cancellation notice that Homeward allegedly received; (2) Homeward's subsequent letter to Plaintiff requesting proof of insurance; or (3) proof, in the form of an insurance policy, that Homeward purchased a replacement policy. Doc. 21 at 4. Plaintiff argues that, rather than produce those documents, Wells Fargo impermissibly relies only on the declaration of Crystal Kearse, an Ocwen employee, whose averments are hearsay. Doc. 21 at 3-4. Finally, Plaintiff asserts that there are genuine issues of material fact in dispute because he stated in his verified petition that he had at all times maintained a homeowner's insurance policy in keeping with the requirements of the Loan documents. Doc. 21 at 4.

As an initial matter, despite being titled as such, Plaintiff's petition is not verified because it is not accompanied by an affidavit or other oath. Accordingly, he cannot rely on it to defeat summary judgment. *Grogan v. Kumar*, 873 F.3d 273, 279 (5th Cir. 2017) (holding that adequate summary judgment evidence includes declarations as well as verified pleadings that are dated and made under penalty of perjury). That notwithstanding, the statements he points to consist solely of his conclusory allegations which are contradicted by the documents Defendants present. *Harvill v. Westward Comm'n, LLC*, 433 F.3d 428, 440 (5th Cir. 2005) (holding that a

plaintiff could not overcome summary judgment motion based on the conclusory allegations in her affidavit). Plaintiff simply has not presented any evidence whatsoever to support his claim that he maintained homeowner's insurance on the Property at all times.

On the other hand, Kearse's declaration is sufficient evidence to sustain summary judgment in Wells Fargo's favor on Plaintiff's breach of contract claim. Kearse avers that she is employed by Ocwen as a senior loan analyst, that she has access to electronic records and files of imaged loan documents, and knows how such records are maintained. Doc. 20 at 4. Kearse goes on to describe how Ocwen stores records received from other parties, such as prior mortgagors and vendors, in relation to loans that Ocwen services and that she has gained personal knowledge of all the facts stated in her declaration through her job duties, responsibilities, and review of the loan documents in this case. Doc. 20 at 4. Kearse signed her declaration under penalty of perjury. Doc. 20 at 8. This is sufficient to support Defendants' claims as they relate to the documents that Plaintiff challenges. *FDIC v. McCrary*, 977 F.2d 192, 194 (5th Cir. 1992) ("The affidavit of an employee who is the custodian of records, generally suffices as proof of a note's ownership for summary judgment.") (citation omitted).

Thus, as can be seen from the undisputed facts set forth above, Homeward had reason to believe that Plaintiff had allowed the homeowner's insurance on the Property to lapse. Accordingly, pursuant to the terms of the DOT and the Escrow Account Agreement, Homeward was authorized to purchase LPI to ensure that its rights with respect to the Property were secured. Doc. 20 at 13-14, 23. The actions Homeward took thereafter all flowed from its rightful purchase of the LPI; thus, none of Wells Fargo's subsequent actions or lack thereof constitute a breach of the DOT. Moreover, as Wells Fargo points out, it was not even a party to the DOT until June 2011, months after the events in question already had transpired. Doc. 20 at

24; *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 295 (2002) ("It goes without saying that a contract cannot bind a nonparty.").

Also meritless is Plaintiff's assertion that Wells Fargo was obligated to "recalculate the amounts of principal and interest that should have been credited to his account" due to the alleged error in Homeward's purchase of LPI and creation of an escrow account.  By the time Wells Fargo became a party to the DOT, Homeward already had received proof of insurance from Plaintiff, cancelled the LPI policy, restored Plaintiff's mortgage payment to what it had been before the escrow account was established, applied the refunded insurance premium to Plaintiff's escrow account, applied the resulting overage in Plaintiff's escrow account to principal and interest then due, reversed all late charges that had accrued on the Loan, and requested a change in credit reporting so the Loan would be reported as "current" for the affected months.  Plaintiff has not directed the Court to any support for his proposition that Wells Fargo owed him a legal duty to revisit Homeward's alleged errors, and the Court can find none. Finally, as Wells Fargo aptly notes, "any ill effects resulting from the lender-placed policy were wiped away, and Plaintiff has no evidence of any harm resulting therefrom" – and certainly none resulting from Wells Fargo's actions.  Doc. 23 at 3-4.  Wells Fargo is thus entitled to summary judgment on Plaintiff's breach of contract claim.

    2. *TDCA Claims*

Plaintiff complains that Defendants violated sections 393.303 and 393.304 of the TDCA by (1) attempting to collect from him amounts that were neither due nor authorized under the terms of the Loan documents; (2) attempting to collect interest in excess of the amounts authorized by the Loan documents or law; (3) using deceptive means to collect a debt by misapplying payments received and imposing unauthorized charges on his account; (4)

misrepresenting the amount or character of the debt by misstating the Loan balance and accrued interest; and (5) collecting interest or other charges that were not authorized by the Loan documents or by law. Doc. 1-4 at 13-14.

Section 392.303(a)(2) of the Texas Finance Code prohibits a debt collector from "collecting or attempting to collect interest or a charge, fee, or expense incidental to the obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer." Section 392.304(a)(8) prohibits a debt collector from "misrepresenting the character, extent, or amount of a consumer debt, or misrepresenting the consumer debt's status in a judicial or governmental proceeding." Section 392.304(a)(19) provides that a debt collector may not use any false representation or deceptive means to collect a debt or contain information about a consumer.

As relevant here, Defendants argue that Plaintiff's TDCA claims fail because all interest, fees, and escrow items charged to Plaintiff following its purchase of the LPI policy were authorized by the DOT and the Escrow Account Agreement. Doc. 19 at 18. Thus, there was no misrepresentation as to the amount of the Loan, nor were false or deceptive means used to collect on the Loan or to obtain information concerning Plaintiff. Doc. 19 at 18. Defendants further note that, in any event, any purported violations of the TDCA were committed by Homeward, not Wells Fargo or Ocwen. Doc. 19 at 18-19.

Plaintiff responds that his verified petition asserts facts that create a genuine issue of material fact making summary judgment inappropriate, and Defendants, not Homeward, wrongly declared the Loan to be in default, reported adversely to credit reporting agencies, and commenced an unwarranted foreclosure proceeding. Doc. 21 at 6-7.

For essentially the same reasons Plaintiff's breach of contract claim fails, so do his TDCA claims.  First, there were no violations of the TDCA because Homeward did not err in purchasing LPI.  Thus, there were no resulting misrepresentations or unlawful collection attempts.  Further, as discussed *supra*, the actions Plaintiff complains of were taken by Homeward, not Defendants.  Although Wells Fargo did initiate a foreclosure proceeding, it was based on Plaintiff's subsequent default on the Loan in April 2012, after Wells Fargo had acquired it, not because of any of Homeward's actions.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's TDCA claims.

### 3. *Declaratory Judgment*

Plaintiff seeks a declaratory judgment to the effect that he properly made all of his Loan payments, maintained insurance, and paid property taxes, but Defendants did not properly apply those payments and misstated that the Loan was in default.

When a state-filed declaratory judgment action is removed to federal court, it is construed as an action brought under the federal Declaratory Judgment Act, 28 U.S.C. § 2201.  *Coleman v. Bank of New York Mellon*, 969 F.Supp.2d 736, 754 (N.D. Tex. 2013).  That Act provides that a federal court may declare the rights and legal relations of any interested party.  The availability of a declaratory judgment depends upon the existence of an underlying judicially remediable right.  *Schilling v. Rogers*, 363 U.S. 666, 677 (1960).  In this case, Plaintiff's request for declaratory relief depends on his meritless breach of contract and TDCA claims.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim for declaratory relief.

### E. Conclusion

For the reasons stated above, Defendants' *Motion for Summary Judgment*, Doc. 18, should be **GRANTED**.

**SO RECOMMENDED** on August 20, 2018.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).  To be specific, an objection must identify the finding or recommendation to which objection is made, state the basis for the objection, and indicate where in the magistrate judge's report and recommendation the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE